**Donald J. Chonowski, Plaintiff-Appellant, v. Joseph S. Sikora, Defendant-Appellee.**

Gen. No. 67–47.

Third District.

March 7, 1968.

Roger V. Pierson, of Princeton, and Joseph B. Lederleitner, of Chicago, for appellant.

McNeilly & Olivero, of Peru, for appellee.

ALLOY, P. J.

Donald J. Chonowski filed an action in which he sought recovery of 26 head of cattle under the first count of the complaint, and under a second count he sought double the value of 17 unreturned cattle under the provisions of the Estrays Act (1965 Ill Rev Stats, c 50). The case was tried by a jury and two special interrogatories were submitted to the jury. One recited "Do you find from a preponderance of the evidence that the defendant was guilty of wrongful-taking or detaining the cattle of plaintiff?" The second interrogatory read "Do you find from a preponderance of the evidence that the defendant violated the Estray Statute of the State of Illinois?" The jury answered both of these interrogatories "No" and the jury also returned verdicts for defendant on both counts and made the following special finding:

> "We further find that the defendant is entitled to the right to possession of no steers replevied by the plaintiff."

Under the first count which was couched as a replevin action, the sheriff had picked up nine cattle from defendant's farm and delivered such nine cattle to plaintiff. It was such nine steers to which the jury referred in the special finding. Judgment was entered upon the verdicts and the findings. Plaintiff's post-trial motion with respect to the judgment was denied.

On appeal in this court, plaintiff Donald J. Chonowski asserts that the verdicts and answers to the interrogatories are against the manifest weight of the evidence and are also inconsistent with the special finding as to plaintiff's right of possession under the evidence and the law; and plaintiff likewise asserts that the Replevin Act and the Estrays Act are in pari materia and that defendant Joseph S. Sikora's possession of cattle without

giving statutory notice, knowing the cattle to be strays, was "wrongful" under both statutes.

Apparently, neither plaintiff nor defendant had taken seriously the oft repeated adage popularized by Robert Frost, that "good fences make good neighbors." They had adjoining farms and their fences were apparently rather porous. The record discloses that plaintiff contended that he had no cattle on his farm in 1965 until April of that year and that during April and May of that year he purchased 74 head of cattle. The births and deaths of cattle kept the number at 74 until the fall of 1965. Plaintiff testified that he missed nine of his cattle in May or June of 1965 and that around November 1965, he counted and found that he was missing 26 head at that time. While plaintiff attempted to locate the missing cattle, at no time did he make a demand on defendant for any of his cattle which he may have suspected that defendant was keeping. The cattle were not marked with any distinctive brand and the only cow which plaintiff could, with reasonable certainty, identify was a cow with a "red mask"—or red markings upon its face. Plaintiff had asked a deputy sheriff to check the property of defendant to see if he was holding any of these 26 cattle but the deputy sheriff reported he found none. Plaintiff then asked a neighbor to check on this and the neighbor reported seeing a few cattle on defendant's land, 12 to 14 head at the most, including nine which were locked in defendant's barn. Plaintiff could see defendant's farm from his land and stated that the maximum number of cattle of any kind that he observed on defendant's farm during the year 1965 between February until December of 1965 was between 11 to 14 in total. Nowhere in the record was there any testimony of anyone who had observed defendant in possession of more than 14 cattle at any one time during 1965. Plaintiff also testified that before he sold the remainder of his group of 74 cattle, he had purchased 10 more head of cattle from his son and

sold them as part of that group. The testimony of plaintiff as to the disputed extra 10 head was rather vague but he did state that he sold 67 head of cattle in January of 1966 (of which he stated that 10 were purchased from his son). The net result was that plaintiff claimed that out of his original 74 head, 26 were lost at one time, reducing his total to 48, but that nine were replevied bringing his total back up to 57 and these 57 were sold in January of 1966. After deducting the 57 from the 74 which left a remainder of 17, plaintiff claims that this is the total number of cattle which he lost or were still missing.

The defendant, his wife and his son all testified that they had some of their own cattle on the farm from the spring of 1965 through the end of the year. They also testified that some cattle broke into their cornfield and strayed upon their farm in October or November of 1965. They locked these cattle in the barn and defendant requested the sheriff of Bureau County to come to his farm to see the cattle that came upon his land. The sheriff came to the farm in the fall of 1965 but he did not attempt to advise defendant as to what could be done with the estray cattle. On November 30, 1965, the sheriff went to defendant's land under a replevin writ and took possession of the nine cattle that defendant was holding and served the writ upon defendant for the return of 26 cattle. Defendant was at work in the City of Peru, Illinois, when the writ was served and there was some vague testimony as to the conversation between the sheriff and defendant. The sheriff testified he was not sure if defendant meant by selling the "others" that he sold cattle that the defendant owned or a neighbor's cattle. Defendant specifically denied in his testimony that he told the sheriff that he sold any cattle belonging to anyone else but only referred to cattle belonging to him, the defendant. Defendant testified that he sold 18 head of cattle which were partly his cattle and partly his son's cattle

during the year 1965 during which they had 40 to 45 head of cattle on the farm.

On the record before us, in view of the testimony which was presented, it cannot be stated that either the general verdict finding for the defendant on both counts or the answers to both special interrogatories were against the manifest weight of the evidence. The answers to the interrogatories found that the defendant was not guilty of wrongful taking or detaining plaintiff's cattle and also that defendant did not violate the Estrays Act. The evidence, as indicated in the recital of facts, was such that the jury could reasonably have determined that plaintiff could lose a total of 17 head of cattle and likewise affirmatively, that defendant was not holding any of plaintiff's cattle. There were no identifying marks on any of plaintiff's cattle with the exception of the so-called "red mask" on one of the cows. No such cow was found in possession of defendant. There was no testimony in the record that the cattle on defendant's land were the cattle of plaintiff. When the nine cattle were picked up by the sheriff as a result of the replevin writ, plaintiff asserted that they were his, but there was no showing in the record as to how he identified them. Defendant knew the nine cattle were not his, but testified that he did not know to whom they belonged and did not assert any right in himself as to such nine cattle. It is unnecessary to review in detail the evidence which was presented by plaintiff and defendant other than to state that it was conflicting. The finding of the jury, therefore, was obviously not against the manifest weight of the evidence. In considering jury verdicts we must adhere to the principle that the jury was justified in considering the evidence in a light most favorable to defendant (Danile v. Oak Park Arms Hotel, Inc., 55 Ill App 2d 2, 203 NE2d 706).

The Estrays Act referred to by plaintiff establishes a procedure whereby the owner of land, upon which

livestock estrays, can post notices and have the estray recorded in the township "town estray book" with the ultimate objective of claiming ownership of said cattle; provided no one claims the estrayed cattle within one year and pays the expense of keeping the cattle. A further provision in § 35 of the Estrays Act provides a penalty for selling any such cattle in the amount of double the value of the property to be recovered in a court of competent jurisdiction in the name of the owner. It is thus apparent that the purpose of that statute was to establish a procedure whereby a person upon whose land cattle has strayed could eventually obtain ownership after he followed the statutory requirements. If he does not follow such procedure he is subject to a fine (§ 34) and if he sells the livestock, the owner can recover double the value of the property sold. The case before us was not a proceeding for a fine and the jury did not find that plaintiff was the owner even of the nine cattle returned to him or that he was the owner of an additional 17 cattle which plaintiff claimed defendant sold. All the jury found was that the nine cattle returned under the replevin writ were not the property of defendant. On the basis of the record, since plaintiff was not found by the jury to be the owner of the nine cattle or of the additional cattle as he claimed, plaintiff had no standing in the civil action under the Estrays Act to contend that defendant violated the act. Under § 35 the civil action for double the value of the property must be maintained in the name of the owner of the livestock. Plaintiff did not establish that he was the owner, so he could not take advantage of the Estrays Act. The jury was, therefore, justified in determining that defendant did not violate that act. The failure to give a proper notice under the act may have been punishable by a fine but we are not here confronted with a criminal action.

■ The attempt to link the Estrays Act and the Replevin Act together under the theory that the statutes

59

relate to the same subject and are in pari materia is based upon the case of Spring Hill Cemetery of Danville v. Ryan, 20 Ill2d 608, 170 NE2d 619. The Spring Hill case involves statutes relating to cemeteries and both statutes were construed together since they both dealt with the same subject. There is no basis for applying such a concept to the two separate statutes on Replevin and Estrays for the purpose of construing these statutes together. As a matter of fact, it is rather difficult to determine what advantage plaintiff would be seeking by having the two statutes construed together, other than to conclude, if defendant held the livestock without giving the proper notice under the Estrays Act, that this would be a violation of the Replevin Act. Since the jury did not determine that plaintiff was the owner of the cattle, it is difficult to see what, if anything, could be gained by construing the two statutes together as suggested by plaintiff. In any event, we see no basis for so construing the two acts.

 Special interrogatories and special findings, if they are inconsistent with the general verdict, can sometimes operate to set aside a general verdict (Todd v. Borowski, 25 Ill App2d 367, 375, 166 NE2d 296). In the Todd case, the court stated:

> "Special interrogatories are used for the purpose of testing the general verdict against the jury's conclusions as to the ultimate controlling facts—the statute expressly provides that the answer to the special interrogatory controls the general verdict when inconsistent, and it may not be nullified by disregarding its mandate: Wise v. Wise, et al., supra. The affirmative or negative answer of the jury to a proper special interrogatory of either party as to a material question of ultimate fact, such as the alleged wilful and wanton acts of either party, is binding on the trial court (upon the other party's motion to set it

aside) unless such is not supported by any competent evidence, or unless it is against the manifest weight of the evidence: Paul v. Garman, et al., supra."

We have also approved this rule (Kubajak v. VerBrugge, 59 Ill App2d 344, 207 NE2d 344).

In the case before us, however, the jury found the issues for defendant under both the replevin count and the estray count. They also made a special finding that defendant was not entitled to possession of nine steers replevied by the plaintiff. It is notable that at no time did defendant claim ownership of the nine cattle which were replevied by the plaintiff. He did not seek a return of these cattle in his answer or during this trial. Defendant and his family all testified that these cattle wandered upon defendant's land and they had to lock them in the barn to keep them from destroying the crops. The jury, therefore, recognized that these nine cattle were not defendant's cattle, but that they were merely a nuisance to defendant. The jury did not find, in such special finding, that the nine cattle belonged to the plaintiff, but simply that they should not be returned to defendant. The possession was, therefore, left with the plaintiff, but plaintiff would still have had the burden of proving his ownership of these nine cattle if such ownership was questioned in the future in any action.

In this connection, plaintiff argues that a consistent finding in a replevin action, where the jury finds for the defendant, would be for a return of the replevied property to the defendant. This would be true in most cases since defendant would ordinarily request a return of the property to him. In the case before us, however, defendant admitted, by his failure to request a return of the property, that the nine cattle were not his. Under the Replevin Act (1965 Ill Rev Stats, c 119, § 22) it is provided that if the right of property is adjudged against

61

the plaintiff there should be a judgment for a return of the property. In the case before us, the right of property was not adjudged against plaintiff or against defendant in either case so that there was nothing inconsistent in the jury finding that defendant was not entitled to a return of the nine cattle.

The judgment of the Circuit Court of Bureau County was, therefore, proper and should be affirmed.

Affirmed.

STOUDER and SCHEINEMAN, JJ., concur.