GEORGE HENDLE, as Sheriff of McHenry County, Plaintiff, v. WILLIAM H. STEVENS *et al.*, Defendants-Appellants (Margaret E. Lucchetti *et al.*, Defendants-Appellees; Michael E. Fryzel, as Director of the Department of Financial Institutions for the State of Illinois, Defendant).

Second District   No. 2—91—0429

Opinion filed February 6, 1992.—Rehearing denied March 5, 1992.

William H. Stevens, of Crystal Lake, *pro se*, for appellants.

Lahti & Cole, of Crystal Lake (Paul T. Lahti, of counsel), for appellees Alma R. Lopez, Thomas P. Farrell, Ryan T. Baassler, and Jennifer L. Moore.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, George Hendle, sheriff of McHenry County, brought a complaint for declaratory judgment against defendants William and Gladys Stevens (property owners), Margaret Lucchetti, Alma Lopez, Thomas Farrell, Ryan Baassler, Jennifer Moore and Michael Fryzel, Director of the Department of Financial Institutions for the State of Illinois (the Director). Plaintiff sought a judgment declaring the rights of the parties to currency found by the minors Lopez, Farrell, Baassler, and Moore on property owned by William and Gladys Stevens. Following a hearing on plaintiff's complaint, the trial court denied the claims of plaintiff, the property owners, and the Director to the found money. Margaret Lucchetti made no claim to the money. The trial court determined that the minors, as finders, were entitled to the money pursuant to the applicable statutory provisions pertaining to estrays and lost property (Ill. Rev. Stat. 1989, ch. 50, par. 27 *et seq.*), subject to the claim of the true owner. The property owners appeal from the court's judgment.

The evidence as presented at the hearing revealed that on May 4, 1990, at about 11:20 p.m. Detective Beverly Hendle of the McHenry County sheriff's police went to the home of Margaret Lucchetti in Crystal Lake. Mrs. Lucchetti told the officer that her baby-sitter, Alma Lopez, had related to her that some teenagers had found a large sum of money during the previous week. At about noon on the following day, May 5, Detective Hendle and Mrs. Lucchetti proceeded to the wooded area described by Alma and looked for fresh holes. While looking, defendant William Stevens approached the two women and asked if he could help them. At the time, the officer knew she and Mrs. Lucchetti were on someone's property, but she had no idea whose property, as the property was in an "abandoned" state. Detective Hendle testified that the property was wooded and overrun with weeds with piles of junk on it and trails leading throughout. Mr. Stevens did not tell the officer that she was trespassing on his property, and Detective Hendle did not observe any signs stating "no trespassing," "keep out," or anything else of that nature.

Mrs. Lucchetti informed Detective Hendle that kids rode their all-terrain vehicles on the wooded property. Kids were present on the property on the date that Detective Hendle and Mrs. Lucchetti were there, but the officer could not recall if they were on all-terrain vehicles or walking.

Detective Hendle and Mrs. Lucchetti returned to the Lucchetti residence, where they met with Alma Lopez. Alma then accompanied

the detective back to the wooded area to show the officer where she and her friends had found the money. Alma pointed out two holes in the center of the property which were, according to the officer, about six to eight inches across and angled downward so that their depth was indeterminable. A pile of dirt was outside the holes as though an animal had burrowed into the ground. Alma told Detective Hendle that she had returned the money she found to the hole and thrown a little bit of dirt over it. The officer dug in the area with a stick but did not find anything.

Detective Hendle recalled that Alma asked the officer what would happen if the money could be found. The officer told Alma that if she and her friends had kept the money for safekeeping, she should tell Mrs. Lucchetti or the officer so that "everything could be handled properly." If handled properly, the possibility existed that Alma and her friends might be able to claim the money in the future. Detective Hendle did not personally recover any money from Alma or her friends.

About 10:30 p.m. on May 5, 1990, Detective Tom Monday of the McHenry County sheriff's police met with Jennifer Moore and her parents at their home. Jennifer told the officer that she and three of her friends (Alma Lopez, Thomas Farrell, and Ryan Baassler) had found a large amount of money in a vacant lot. According to Jennifer, Alma had lied to Detective Hendle because Alma still possessed the money she found. Jennifer admitted that she had some of the money, and she turned it over to the officer.

At about 11 p.m. of the same day the officer proceeded to the Lopez residence and recovered the money Alma possessed. At approximately 11:53 p.m. Detective Monday arrived at Thomas Farrell's house and collected Thomas' portion of the found money. From there the officer proceeded to the home of Ryan Baassler, where he recovered more of the money. At the home of each of the minors the officer prepared a property inventory sheet, depicting the amount of money recovered, and had the minor sign it. Detective Monday testified that he recovered the money from the minors for safekeeping purposes until the true owner or one determined to be the rightful owner came forward.

Jennifer Moore, who was 14 years old at the time of the discovery of the money, related that she found the money in the woods across the street from her house. Jennifer stated that kids customarily ventured into the wooded area, that no signs warned them not to go on the property, that the owner never asked them to stay off the property, that other neighborhood children played on the property, and

that the property contained trails for all-terrain vehicles and bicycles. Jennifer stated that she found the money on April 30 or May 1 at about 4:30 or 5 p.m. She and Thomas Farrell were walking through the woods when she discovered two holes. Jennifer kicked a mound of dirt next to one of the holes and saw some loose money. Jennifer and Thomas were joined by Alma and Ryan. All four minors grabbed as much money as they could and ran to Jennifer's house, where they went behind a shed and counted the money.

After Alma, Thomas, and Ryan went home Jennifer hid her money; she did not tell her parents about the money. The following Saturday Jennifer and two of her friends went shopping. Jennifer gave each friend $100 of the money. The friends returned to Jennifer any money which they did not spend. On that same day Jennifer told her mother about her discovery. That evening Detective Monday arrived, and Jennifer gave him all the money she possessed. Later, she recovered from her friends the items they bought and returned them. Jennifer was able to recover all the money spent except the money expended for a T-shirt, which could not be returned, and $5 to $10 spent on food. Jennifer gave the recovered money and the T-shirt to Detective Monday.

Jennifer acknowledged that she did not file any documents with the court within five days of May 1, 1990, claiming ownership of the money. Jennifer did not know whether her parents took such action.

According to Thomas Farrell, who was 13 years old at the time of the discovery, the money was found on May 1 while he and some friends were wandering in the woods behind a house (the Stevenses' house). Thomas related that Jennifer was looking down a hole and that she turned around and kicked over some dirt, making the money visible. Thomas recalled that the money was not "really loose" but that he was "pretty sure it was organized by string or rubber band or just stacked together." By the time Alma and Ryan joined Thomas and Jennifer, Jennifer was holding the money in her hands, and the others grabbed some money from her. The minors then ran to the shed behind Jennifer's house and counted the larger bills.

When Thomas arrived home, he told his mother and father about the money. His father advised him to count the money, place it in an envelope, and put it with his deposit slips. Thomas stated that he did not spend any of the money.

Thomas recalled that on May 5 at about 10:30 p.m. Detective Monday picked up the money Thomas had kept. According to Thomas, the officer told him to wait six months to see if anyone claimed the money and if no one did, the money would belong to the minors. Ac-

cording to Thomas, the officer indicated that there was nothing further Thomas was required to do except to wait. Thomas acknowledged that he never filed any document at the courthouse claiming ownership of the money prior to the time Detective Monday arrived at his house.

Alma Lopez, 15 years old at the time of the discovery, described the place where the money was found as having lots of weeds, trees, and trails. Alma stated that she had been in the area many times and that she had never been asked by the owner to stay out of the area nor had she ever seen any "no trespassing" signs posted. Alma related that she and the other minors were just wandering around in the area on April 30 or May 1 when Jennifer called to Alma and Ryan. When they joined Jennifer, the money was, according to Alma, on the ground stacked together with a rubber band. Jennifer picked up the money, and the minors all took some of it. Alma recounted that she and the other minors went to Jennifer's house and counted the money behind Jennifer's shed before going home.

When Alma arrived home, her father told her not to do anything with the money. He took possession of the money and hid it. He never advised her to call the police. Alma admitted that when Detective Hendle and Mrs. Lucchetti spoke with her on May 4, she lied about knowing where the money was because she wanted to keep it. When Detective Monday appeared at her house on May 5, Alma turned the money over to him. The officer told her that she would have to wait six months to see if anybody claimed the money. Alma acknowledged that between the date on which she and the others found the money and May 5 she made no effort to find the true owner or to file any documents at the courthouse claiming ownership of the money.

Ryan Baassler, 13 years old at the time the minors discovered the money, described the property where the money was found as "wooded" or "wild" with a couple of trails through it. According to Ryan, Jennifer and Thomas were walking in the wooded area on May 1, 1990, with Alma and Ryan following behind when Jennifer found some money on the ground and picked it up. Ryan remembered the money was loose "with no fasteners around it." Ryan said he took some money from Jennifer's hands. Then, all the minors proceeded to Jennifer's house, where they made a rough count of the money.

When Ryan arrived home, he put his money in his closet. He did not tell his parents about the money until Detective Monday came to recover it on May 5 because he wanted to keep the money. When Detective Monday arrived on the night of May 5, Ryan turned over to the officer the money he still possessed. Subsequently, Ryan recovered

$145 he had given his mother to put in the bank and also replaced with his own money the money he had spent on a couple of T-shirts. Ryan recalled hearing Detective Monday state that there was a six-month waiting period and if no one claimed the money within that time, the money would be returned to the minors. Ryan acknowledged that he never tried to find the true owner of the money between the time of the discovery and the time of Detective Monday's recovery nor did he file any documents at the courthouse claiming ownership of the money.

Thomas Farrell, Sr., testified that he was present on the evening of May 5 when Detective Monday came to collect the money found by his son. Mr. Farrell related that he wondered if his son was obligated to try to contact the rightful owner or if his son could claim ownership of the money if the rightful owner was not found. Consequently, he asked Detective Monday if there was any further action that needed to be undertaken. Detective Monday replied negatively. According to Mr. Farrell, he assumed from the officer's negative response that his son had no further obligations or responsibilities under the law. Mr. Farrell acknowledged that he did not file any documents with the court claiming ownership of the money for his son nor did he attempt to find the true owner.

Subsequent to the hearing, the court entered its order finding that the minors were not trespassers, that the money was lost, that the discovery of the money on private property did not preclude the application of the statute pertaining to estrays and lost property (Ill. Rev. Stat. 1989, ch. 50, par. 27 *et seq.*), that the minors substantially complied with the requirements of the estrays statute, that the total value of the found money was $6,061, and that the minors were entitled to pursue their claim to the money subject to the claim of the true owner. This appeal by the property owners, William and Gladys Stevens, ensued. Neither plaintiff nor the Director of the Department of Financial Institutions for the State is a party to the appeal.

On appeal the property owners contend: (1) that the trial court erred in failing to consider the found money as embedded in the soil and, therefore, belonging to the property owners under common law; (2) that the trial court erred in finding the evidence failed to establish the minors as trespassers; (3) that the trial court erred in finding the evidence ambiguous as to whether the money constituted lost, mislaid, or abandoned property; and (4) that the trial court erred in applying the applicable provisions of the estrays statute to the money found by the minors.

■ The property owners first argue that the trial court erred in failing to consider that the money at issue was embedded in the soil on their property at the time of its discovery. They assert that, if embedded, the money belongs to them under common law. The property owners base their failure to consider claim on the fact that the trial court's memorandum opinion made no specific finding of fact regarding the embedment theory. However, where a trial court fails to make a detailed finding of fact, this court must presume that the trial court found the issue and controverted facts in favor of the prevailing party. (*Kern v. Rafferty* (1985), 131 Ill. App. 3d 728, 731.) Here, the court's opinion specifically mentioned that in reaching its decision it reviewed the written memoranda filed by the parties and considered the evidence, arguments, and authority presented. As the property owners' embedment argument was set forth in its memorandum in support of its position, we must presume that the trial court considered it and rejected it.

We move on, therefore, to address whether the trial court was correct in rejecting the property owners' embedment theory. At the same time we address the property owners' contention that the minors were trespassers.

Relying on *Bishop v. Ellsworth* (1968), 91 Ill. App. 2d 386, the property owners maintain that the evidence established that the money was "embedded" in their land and that, therefore, under common law the money was rightfully theirs. In *Bishop* the owner of a salvage yard filed a complaint alleging that defendants, three small boys, entered his salvage yard without his permission and found a bottle containing a large sum of money partially embedded in the loose dirt on top of a landfill. Complainant asked the court to determine who had the right to possess the money. Minors filed a motion to dismiss on the ground that plaintiff's complaint did not state a cause of action. After hearing arguments of the parties, the trial court dismissed plaintiff's complaint. Plaintiff appealed, contending that an owner of land has a right to possession of all property in, on, and under it and that his complaint alleging that the boys, as trespassers, took the money from plaintiff's private property was sufficient to state a claim to possession of the discovered money.

In *dictum*, the court discussed the estrays statute and concluded that this statute, governing the disposition of lost property, did not totally abrogate the common law with respect to possession of discovered property since the statute assumed that the discoverer had a right to be where he was when he discovered the lost property. (*Bishop*, 91 Ill. App. 2d at 390.) The court went on to point out that a

presumption exists that the owner of land or premises has custody of property found on it or actually embedded in the land. According to the *Bishop* court, it would "appear" that if the discoverer is a trespasser on the premises where the lost property is discovered, such trespasser can have no claim to possession of such property even if it might otherwise be considered "lost." 91 Ill. App. 2d at 391.

The court then determined that plaintiff's complaint, which alleged that he was the owner of the land upon which the partially embedded bottle containing the money was discovered and removed by the finders as trespassers, stated a cause of action because it substantially informed defendants of the nature of and basis for the claim. The court reversed the trial court's judgment and remanded the cause. The court made no determination whether the boys were trespassers nor any determination whether they were entitled to the found money. The minors in the instant case comment in their brief that, on retrial, the finders in the *Bishop* case were allowed to keep the money. Counsel for minors states that the retrial attorney is the authority for this comment. Counsel should know, however, that this court cannot and will not consider such unrecorded and unofficial information.

As officially reported, the *Bishop* case does not hold that a property owner's right to lost property discovered on his land could not be abrogated by the terms of the estrays statute. Consequently, the case has no precedential value in deciding the outcome of the instant case. Moreover, we think the *Bishop* court's statement that a trespasser has no claim to possession of lost property is erroneous, as the finder of lost property has a right of possession superior to that of the owner of the premises where the article is found. 1 Am. Jur. 2d *Abandoned, Lost, & Unclaimed Property* §19 (1962).

In a later case, *Paset v. Old Orchard Bank & Trust Co.* (1978), 62 Ill. App. 3d 534, the court determined, as have we, that the *Bishop* court's reference in its decision to the inapplicability of the estrays statute to a situation where the discoverer of lost property is a trespasser was *dictum*. 62 Ill. App. 3d at 541.

■ Elsewhere in its decision, the *Paset* court pointed out that the estrays statute makes no distinction between "public" and "private" places of finding and that, therefore, whether property was discovered in a public or a private place should not be permitted to preclude application of the estrays statute. (62 Ill. App. 3d at 539.) The *Paset* court determined that by imposing liability on a finder of property who fails to comply with the provisions of the estrays statute (Ill. Rev. Stat. 1989, ch. 50, par. 34), the statute itself indicated that the

legislature never intended to "circumscribe the word 'lost' with technical or restrictive concepts" such as determining whether the property was lost or mislaid, discovered in a public or private place, or in the constructive possession of the one on whose premises it is found. (*Paset*, 62 Ill. App. 3d at 539.) To impose a responsibility upon the finder "to wade through" such concepts to decide whether the statute required him to appear before the circuit court and report his discovery (Ill. Rev. Stat. 1989, ch. 50, par. 27) would be, in the opinion of the *Paset* court, insensible. We agree and find that to construe the statute in any other manner would defeat the statute's purposes, as stated in *Paset*, of encouraging and facilitating the return of property to the true owner and of then rewarding the finder for his honesty if the property remains unclaimed. (See *Paset*, 62 Ill. App. 3d at 537.) Consequently, regardless of whether the minors in the instant case were on private property at the time of their discovery or that the money was embedded in or scattered loosely in dirt on the property, under *Paset*, the estrays statute applies to the find.

Moreover, even if *Bishop* established that a trespasser has no rights to property he finds, the holding would not apply here, as the trial court determined that the minors were not trespassing at the time of their discovery. The testimony of the minors indicated that they and other children customarily ventured into the wooded area where the money was found. Jennifer, Alma, Ryan, and Detective Hendle described the presence of trails throughout the area. Both Alma and Jennifer, who had been in the area many times, testified that no one had ever asked them to stay out of the wooded area nor were there any signs warning them not to enter. Detective Hendle described the area as in an "abandoned" state, wooded, overrun with weeds, and with piles of junk on the property. Detective Hendle related that on the date that she and Mrs. Lucchetti were wandering through the property kids were also present on the property.

■ A trespasser is one who enters the premises of another for his own purposes without permission, invitation or other right. (*Lee v. Chicago Transit Authority* (1990), 205 Ill. App. 3d 163, 168.) Habitual acquiescence in a trespass may constitute a license for persons to enter upon the land if the tolerance is so pronounced as to be tantamount to permission. (*Sumner v. Hebenstreit* (1988), 167 Ill. App. 3d 881, 885.) Relying only on the fact that all the minors acknowledged that they had never met the property owners, the property owners argue that no evidence was presented to show that they had knowledge of the trespasses by the minors so as to amount to consent or permission to enter upon their property.

■ On the occasion when Detective Hendle and Mrs. Lucchetti were present on the property, however, Mr. Stevens noted their presence and asked if he could be of assistance although he did not inform the women that they were on his property. We find it unlikely, therefore, that the property owners never noticed children traversing their property or playing on it especially when some of those children apparently rode all-terrain vehicles throughout the wooded area.

The trial court did not provide a detailed explanation for its finding that the minors were not trespassers. Nevertheless, the testimony established that the children and others frequented the property, that children were present on the property at the time Detective Hendle and Mrs. Lucchetti were there, that Mr. Stevens noticed the women's presence on his property but did not mention they were trespassing, and that Mrs. Lucchetti told the officer that children rode all-terrain vehicles on the property. Given these facts, it is not unreasonable to presume that the trial court determined that the property owners knew, or should have known, that children were in the habit of entering their land and traversing it, that the property owners acquiesced in these repeated trespasses, and that, therefore, the minors were not trespassers.

On appeal, all reasonable presumptions are in favor of the trial court's action, and the burden is on the appellant to show affirmatively the errors assigned on review. (*In re Marriage of Smith* (1985), 132 Ill. App. 3d 694, 702.) Here, we believe that the property owners have not met their burden and that the record supports the presumption that the trial court acted properly in finding that the minors were not trespassers.

■ We next address the property owners' contention that the trial court erred in finding the evidence ambiguous as to whether the money constituted lost, mislaid, or abandoned property. Property is mislaid when it is intentionally put in a certain place and later forgotten; property is lost when it is unintentionally separated from the dominion of its owner; and property is abandoned when the owner, intending to relinquish all rights to the property, leaves it free to be appropriated by any other person. (*Michael v. First Chicago Corp.* (1985), 139 Ill. App. 3d 374, 382.) A finder of property acquires no rights to mislaid property, is entitled to possession of lost property against everyone except the true owner, and is entitled to keep abandoned property. (139 Ill. App. 3d at 382.) It is the property owners' position that the money was not lost or abandoned but "probably mislaid" because it was buried in the soil in a stacked or organized fashion.

■ Contrary to the property owners' contention in their brief, the evidence did not establish that the money was buried in a hole or that its location was marked by two holes in the ground. Rather, the evidence indicated that the money was found in a mound of dirt near the two holes when Jennifer Moore kicked it. None of the minors testified that the money was discovered in a hole or that they dug it up. Detective Hendle described the two holes, which property owners assert marked the location of the money, as approximately six to eight inches across and angling downward so that the bottom of the holes could not be seen. In the officer's opinion the holes appeared to have been burrowed into the ground by some sort of animal.

The minors differed in their recollection of the condition of the money at the time of discovery. Jennifer, who actually discovered the money and picked it up, stated it was loose. Thomas Farrell, Jr., who was walking with Jennifer at the time of the discovery, was less certain regarding the state of the money. He testified that it was not "really loose" and that he was "pretty sure it was organized by string or rubber band or just stacked together." Alma Lopez and Ryan Baassler, who joined Jennifer and Thomas after Jennifer's discovery, did not agree regarding the appearance of the money. Alma stated that the money was stacked together with a rubber band, while Ryan remembered that the money was loose, "kind of a stack and a pile" but with no fasteners around it. All the minors testified that they grabbed or took some money out of Jennifer's hands. This fact and the fact that the children ended up with varying and unequal amounts of money imply that the money was not fastened in one stack by a rubber band. Nevertheless, even if the money was in such a state, that state does not establish that it was mislaid. It could just have easily been abandoned or lost in that condition.

At any rate, it is unclear from the circumstances of the discovery of the money in a mound of loose dirt how the money got there or what the intent of the true owner was. Parenthetically, we agree with the minors that the property owners' contention in their brief that the true owner "probably mislaid" the money demonstrates the ambiguity regarding the nature of the found property.

We conclude that the trial court did not err in finding that the evidence was ambiguous as to whether the money constituted lost, mislaid, or abandoned property and that any ambiguity, as a matter of public policy, should be resolved in favor of the presumption that the money was lost. (See *Paset v. Old Orchard Bank & Trust Co.* (1978), 62 Ill. App. 3d 534, 538.) As "lost" property the minors were entitled to possession of the money against everyone except the true owner.

Last, we address the property owners' contention that the trial court erred in applying the estrays statute (Ill. Rev. Stat. 1989, ch. 50, par. 1 *et seq.*) to the found money. Specifically, the property owners argue that because the minors failed to file an affidavit with the court within five days of the discovery of the money, stating where and when the money was found, that the money was unaltered in its appearance, and that none of it was secreted, disposed of, or withheld, the minors did not comply with the requirements of section 27 of the statute. (Ill. Rev. Stat. 1989, ch. 50, par. 27.) Therefore, they were barred from pursuing this statutory remedy.

■■ We, however, agree with the minors' contention that the property owners have no standing to contend that the minors violated the statute. In *Chonowski v. Sikora* (1968), 93 Ill. App. 2d 53, the court determined that one who was not found to be the true owner of livestock estrays possessed no standing to challenge compliance with the estrays statute. We believe this finding is equally applicable to the instant case involving lost property since, according to section 1 of the statute, estrays "may be taken up" in the "same manner as provided for lost goods." As the money is lost property, or goods, and as the property owners admitted in their pleadings that they were not the true owners of the money, they lacked standing to challenge the minors' compliance with the estrays statute.

Without citation to any authority, the property owners contend that the minors have waived this standing argument because they did not raise it in the trial court. Although an appellant is precluded from raising an issue for the first time on appeal, an appellee may urge any point in support of the judgment on appeal as long as a factual basis for such point was before the trial court. (*Jackson v. Chicago Board of Education* (1989), 192 Ill. App. 3d 1093, 1099.) Here, the factual basis for the minors' point that the property owners were not the true owners of the property was before the lower court and, thus, the minors' standing argument is properly before this court.

For all the reasons stated above, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

DUNN and BOWMAN, JJ., concur.