BURNS PHILP FOOD, INC., Plaintiff–
Appellee, Cross–Appellant,

v.

CAVALEA CONTINENTAL FREIGHT,
INC., et al., Defendants–Appellants,
Cross–Appellees.

Nos. 97–2557, 97–2737.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1998.

Decided Feb. 4, 1998.

Daniel J. Voelker (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Burns Philip Food, Incorporated.

William D. O'Donaghue, Chicago, IL, J. Reed Millsaps (argued), Northbrook, IL, for Cavalea Continental Freight, Inc., Anthony C. Cavalea, III, and Arthur H. Cavalea.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Nabisco broke up a tract of industrial real estate in Chicago. Cavalea Continental Freight bought several parcels and Burns Philp Food the remainder. In 1986 real estate records were changed to reflect these transactions, but something went awry. Tax officials treated Burns Philp as the owner of two parcels that Cavalea had purchased, and Burns Philp paid without inquiry or protest. In mid–1993 Burns Philp finally noticed that since 1987 it had paid almost $125,000 in taxes on Cavalea's land, and it sought reimbursement. Instead of resolving matters amicably, these neighbors have acted like the Hatfields and McCoys. Cavalea refused to pay a dime, leading Burns Philp to sue. Cavalea filed a counterclaim accusing Burns Philp of building a fence that encroached onto its parcel. Burns Philp retaliated with an additional claim charging Cavalea with spilling diesel fuel that polluted Burns Philp's land. Other claims were made but have washed out. The district judge held a bench trial on the three we have mentioned and entered a judgment from which, predictably, both sides have appealed.

By paying Cavalea's taxes, Burns Philp mistakenly bestowed a benefit on Cavalea. The district court concluded that Cavalea must make restitution of the amount by which it was unjustly enriched. Cavalea no longer disputes this obligation, but it does contend that restitution should be limited to the taxes Burns Philp paid during the five years before it filed suit. Illinois law governs this diversity case. (As amended in this court under 28 U.S.C. § 1653, the complaint establishes diversity of citizenship and therefore federal jurisdiction.) Cavalea relies on 735 ILCS 5/13–205, which creates a five-year statute of limitations for "actions on unwritten contracts, expressed or implied, . . . and all civil actions not otherwise provided for". As Cavalea sees things, unjust-enrichment claims in Illinois rest on unwritten contracts implied in law and therefore must be commenced within five years. *Partipilo v. Hallman*, 156 Ill.App.3d 806, 109 Ill.Dec. 387, 510 N.E.2d 8 (1st Dist.1987), so holds, and there is no contrary authority. Some other courts have agreed with *Partipilo* that unjust-en-

richment claims in Illinois are "at law" for purposes of the decreasingly important (and therefore increasingly hazy) line between law and equity. *Midcoast Aviation, Inc. v. General Electric Credit Corp.*, 907 F.2d 732, 737 (7th Cir.1990); *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 172 Ill. App.3d 718, 734, 122 Ill.Dec. 725, 737, 527 N.E.2d 97, 109 (5th Dist.1988), *reversed in part on other grounds*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672 (1989). Again there is no contrary authority. Yet the district judge refused to apply 735 ILCS 5/13–205. His entire analysis is:

> I am going to depart from the holding of the Partipilo case and apply my own previous understanding of the law, which is that statutes of limitation do not apply in equity cases, and I think of unjust enrichment as an equity claim.

The judge did not explain *why* he believes that unjust enrichment yields an "equity claim" even though the plaintiff seeks nothing but money, or what authority in Illinois supports that belief.

■ Although the decision of a state's intermediate appellate court is not a conclusive interpretation of state law in the same sense as a decision of the state's highest court, it illuminates the meaning of state law and should be followed "unless there are persuasive indications that the [state's] Supreme Court would decide the issue differently." *Allen v. Transamerica Insurance Co.*, 115 F.3d 1305, 1309 (7th Cir.1997). Even though we indulge the assumption that claims in equity, although denominated "civil actions," are not governed by any statute of limitations in Illinois, but see *Hagney v. Lopeman*, 147 Ill.2d 458, 462, 168 Ill.Dec. 829, 590 N.E.2d 466, 468 (1992); *Eldridge v. Eldridge*, 246 Ill.App.3d 883, 892, 186 Ill.Dec. 818, 825, 617 N.E.2d 57, 64 (1st Dist.1993), we do not find persuasive indications that the Supreme Court of Illinois thinks of restitution as an action in equity rather than at law. Burns Philp has located cases saying that restitution is governed by "principles of equity", e.g., *Board of Highway Commissioners v. Bloomington*, 253 Ill. 164, 174, 97 N.E. 280, 284–85 (1911), but this differs from saying that a claim for restitution is not an action at law. Many wholly legal claims have equitable aspects; think of all the fiduciary duties that exist in the law of contracts or influence the resolution of tort claims, such as those for legal malpractice. *Board of Highway Commissioners* does more to support Cavalea than to assist Burns Philp, for the Supreme Court wrote that restitution is "governed by principles of equity, although the action is at law." And Burns Philp's claim is best characterized as one for restitution rather than constructive trust. Cavalea was not Burns Philp's fiduciary, and it neither received nor held money on Burns Philp's behalf. So the action is at law, and the statute of limitations in 735 ILCS 5/13–205 must be applied.

■ Burns Philp tells us that, because it did not discover the error until 1993, time started to run only then. Yet in Illinois, as in most states, the period begins not with the injury's actual discovery, but when the injury could have been discovered through the exercise of appropriate diligence. See *Vector–Springfield Properties, Ltd. v. Central Illinois Light Co.*, 108 F.3d 806, 809 (7th Cir. 1997); *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976 (1981). Since the day it bought the property from Nabisco, Burns Philp has had in its files everything needed to determine who must pay real estate taxes on which parcels. On receiving in 1987 the first tax bill for property it had not purchased, Burns Philp needed nothing except initiative to send the bill on to Cavalea (and notify the tax collector about the error). Although a corporation need not rifle corporate records unless it has reason, and therefore the presence of stray information does not automatically start the period of limitations, see *Fujisawa Pharmaceutical Co. v. Kapoor*, 115 F.3d 1332, 1334–37 (7th Cir.1997), one normal precaution against error (and fraud) is checking the propriety of invoices before paying. Burns Philp first recognized the erroneous payments in 1993 when a newly appointed manager of the Chicago facilities ordered an audit, which swiftly revealed the problem. A firm's delay in taking such a routine precaution is not a good reason to extend the period of limitations; the costs of a firm's carelessness are

not so readily shifted. On remand the district court must limit Burns Philp's recovery to taxes paid on Cavalea's behalf within five years before filing suit.

Now for Cavalea's counterclaim. Burns Philp constructed a fence on what it thought was the border between its property and Cavalea's. Whoever surveyed the land to fix the border for the fence did a lousy job. The border is 205 feet long. One end of the fence was located several feet inside Burns Philp's lot and the other was 20 feet into Cavalea's. Burns Philp thus occupied about 2,000 square feet of land that belonged to Cavalea. After Ameritech conducted a survey in 1995, Cavalea learned that some of its land was on the other side of the fence. It did not notify Burns Philp of the problem until November 1995, when it filed the counterclaim seeking damages for trespass and an injunction requiring Burns Philp to remove the fence. Burns Philp responded by denying liability; it did not verify the accuracy of Cavalea's survey or move the fence back to the property line. In December 1996 Cavalea ripped out the fence and appurtenances without Burns Philp's leave and placed a large container right at the property line, interfering with the use of Burns Philp's loading dock. Burns Philp now concedes that Cavalea was entitled to do these things. But the district judge held that Cavalea is not entitled to damages, because it did not notify Burns Philp that the fence had been erected on its land. Trespass is a strict liability tort, *Dial v. O'Fallon*, 81 Ill.2d 548, 553–54, 44 Ill.Dec. 248, 411 N.E.2d 217, 220 (1980); *Restatement (2d) of Torts* § 158 (1982), and an obligation to notify the intruder is inconsistent with the idea of strict liability. Nonetheless, the district judge stated:

> That [notice requirement] may be difficult to rationalize in terms of the traditional law of trespass, but it's not difficult for me to rationalize in terms of elemental justice, and that's the way I come out.

In diversity litigation, however, state law prevails over notions of "elemental justice." The only question for decision is whether Illinois conditions damages on the landowner's notice to the trespasser. (Cavalea contends that the counterclaim filed in 1995 gave whatever notice state law requires, a possibility the district judge did not discuss, but we need not pursue that prospect.)

Burns Philp locates a notice-to-trespassers requirement in cases holding that a landowner who has consented to entry may not complain about trespass until the consent has been revoked. See *Hendle v. Stevens*, 224 Ill.App.3d 1046, 1055–56, 166 Ill.Dec. 868, 874–75, 586 N.E.2d 826, 832–33 (2d Dist. 1992); *Sumner v. Hebenstreit*, 167 Ill.App.3d 881, 885, 118 Ill.Dec. 888, 890, 522 N.E.2d 343, 345 (5th Dist.1988). The proposition is unremarkable. Trespass is entry without consent; while the consent lasts there can be no trespass, and therefore no legal remedy. How can this assist Burns Philp? Cavalea did not consent to the construction of a fence on its land. Had it done so, a change of mind would not necessarily require demolition of the fence—the original consent may grant a license that can be revoked only with compensation. But Burns Philp did not seek anyone's consent to build the fence. It thought that the fence was on its land, and no one knew otherwise until 1995. Knowledge of a fence's existence is not equivalent to consent—not, at least, when the landowner does not suspect that the border has been crossed. Paths that cut diagonals across parcels with known borders and similarly obvious intrusions, where failure to protest might imply consent, pose different questions. Burns Philp built its fence under a claim of right; it did not seek an express license (or an easement) and did not obtain an implied one; it does not assert that principles of adverse possession entitle it to maintain the fence. Cavalea accordingly is entitled to damages—if it suffered monetary loss.

Cavalea offered evidence that it used the land along its border with Burns Philp to store trailers and freight containers, and that it could have stored 102 additional trailers or containers had the fence been located correctly. It charges shippers and truckers $25 per day to store loaded containers, 75¢ a day for empty truck trailers, and 55¢ a day for empty containers. Proposing that all 102 places would have been used all of the time, Cavalea demanded nearly $1 million in dam-

ages, which would make this the most valuable twentieth of an acre in Chicago. Burns Philp responds that its employees consistently noticed empty places at Cavalea's facility even before the fence was removed, and it argues that access to the extra land accordingly would not have added to Cavalea's receipts. Because it concluded that Cavalea could not maintain an action for trespass, the district judge did not resolve this dispute. It is not our place to play factfinder, see *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986), but we hope that it will prove possible for the new district judge (see Circuit Rule 36) to wrap things up after reviewing the existing record without taking additional evidence.

■ Last and least is Burns Philp's claim for contamination of its land by diesel fuel. Cavalea has been careless (or worse) in creating risks of pollution. It uses a 1974 model tanker-trailer as its diesel refueling station, although the trailer was not designed for this purpose and has not installed a spill-containment system, although both municipal law and ordinary prudence require that step. Fuel has spilled from the tanker onto Cavalea's property, which given environmental obligations will now be hard to resell (the cleanup bill must be paid eventually) and creates a specter of future liability to neighbors. Yet careless conduct is tortious only if it causes injury, and Cavalea denies that any of the spilled diesel fuel has reached Burns Philp's land. Burns Philp's theory is that the diesel fuel flowed on the surface (it has not had time to migrate underground). It tried to prove this by showing that the surface sloped from Cavalea's property toward its own and that at least one location on its land has hydrocarbon residue. The district judge disbelieved the testimony Burns Philp offered, and such a decision is almost impossible to upset on appeal. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The judge concluded that Burns Philp has not even proved which way the surface slopes; it offered principally eyeball estimates, of which the judge was skeptical. There were deeper problems too.

■ Burns Philp's star witness was Russell Chadwick, an environmental consultant who supervised the collection of samples from one location on Burns Philp's site. Chadwick found that the samples contain benzanthracene and other components of petroleum distillates substantially in excess of permissible amounts. Burns Philp asked the judge to infer that because these hydrocarbons could not have come from its own operations, they must have come from Cavalea's. The judge thought that Chadwick's work was unprofessional and the proposed inference unwarranted—in brief, that he had been fed junk science (though the judge did not use that term). The land did not spring into existence when Burns Philp acquired the tract; maybe the hydrocarbons came from operations of prior owners. It was essential to learn whether Cavalea's tanker was the source. At trial the judge inquired why Chadwick had sampled only one location, rather than multiple places in and out of what Burns Philp believes is the runoff path from Cavalea's land. Extra petroleum distillates in the runoff channels, and closer to Cavalea's land, would support an inference about the source; if hydrocarbons are uniformly distributed, however, then they must have other sources. Confined testing is less useful; as both physical and social scientists like to say, an infinite number of lines or planes can be run through a single point. The district judge remarked:

> It appeared to me that [Chadwick] avoided doing the kinds of tests that would have been more likely to identify the source of any contamination of [Burns Philp's] property than were the minimal tests that he did do. His approach was crude and unreliable.... One simple experiment that would have tended to strengthen [Burns Philp's] case in this regard, and which was not done, would have been to test the soil south of the point at which the [samples] were actually taken.... My definite impression is that the reason [Chadwick] didn't do that is, he didn't want to run the risk of getting a result that he wouldn't like and wouldn't fit the conclusion he wanted to draw.

District judges have an obligation to ensure that purportedly scientific expert testimony is reliable. *General Electric Co. v. Joiner*,

—— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The district judge inquired and found the evidence unreliable. It is impossible to call that decision an abuse of discretion, or the resulting findings of fact clearly erroneous.

The judgment is vacated and the case remanded for two purposes: to limit damages for unjust enrichment to the five-year period preceding suit, and to calculate and award the damages (if any) that Cavalea sustained from the trespass.