wastman2 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-374-CV





RAILROAD COMMISSION OF TEXAS; ENVIRONMENTAL TRANSPORTATION


SERVICES, INC.; WASTE PROCESSOR INDUSTRIES, INC.; CHANNEL


TRANSPORTATION CO., INC.; WPI TRUCKING, INC.; TEXAS TANK


TRUCK CARRIERS ASSOCIATION, INC.; ALLWASTE ENVIRONMENTAL


SERVICES; AND BEALINE SERVICE CO., INC.,



 APPELLANTS


vs.





WASTE MANAGEMENT OF TEXAS, INC.,



 APPELLEE




 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT



NO. 494,824, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING



 





 This case requires us to determine whether the Texas Railroad Commission has
jurisdiction to regulate the transportation of certain solid waste for compensation or hire when the
waste in question has no commercial value and its owner seeks only to dispose of it. Waste
Management of Texas, Inc. sued the Railroad Commission in the District Court of Travis County
seeking a declaratory judgment that the Railroad Commission did not have jurisdiction over Waste
Management's transportation of asbestos-containing solid waste. The trial court ruled that the
Railroad Commission did not have authority to regulate the transportation of such waste because
it is not "property" as that term is used in article 911b of the Texas Revised Civil Statutes,
commonly known as the Motor Carrier Act. See Tex. Rev. Civ. Stat. Ann. art. 911b (West 1964
& Supp. 1994) (hereinafter "MCA"). The Railroad Commission and several defendant-intervenors appeal. (1) We will reverse and render judgment.



FACTUAL AND PROCEDURAL BACKGROUND


 Waste Management is engaged in the business of transporting asbestos-containing
solid waste to various disposal sites. Asbestos-containing solid waste consists of asbestos-containing materials removed from facilities or buildings that have been subject to asbestos
abatement and any clothing or material used in carrying out the abatement process. Waste
Management is normally employed to transport and properly dispose of the waste by owners of
such facilities or buildings or by companies hired to remove the asbestos. Such parties are
typically called "generators."

 The Railroad Commission is authorized under the MCA to regulate motor vehicles
that transport "property for compensation or hire." MCA § 4(a)(1) (West Supp. 1994). The
Railroad Commission's authority includes the power to regulate rates and to require that
companies or persons operating vehicles transporting property for compensation obtain permits
or certificates of convenience and necessity from the Railroad Commission. Waste Management
has never been issued a certificate or permit by the Railroad Commission authorizing it to
transport asbestos-containing solid waste. From March 1989 to November 1991, various
generators paid Waste Management to transport and dispose of approximately seventy-one
shipments of asbestos-containing solid waste. Waste Management transported the waste in
company-owned trucks across Texas's public highways, routinely travelling between two or more
noncontiguous incorporated cities, towns, or villages.

 On November 15, 1991, after conducting an audit of Waste Management, an
auditor for the Motor Transportation Division of the Railroad Commission issued violation reports
to Waste Management concerning its transportation of the waste. In April 1992, the manager of
the Transportation Audit Division of the Railroad Commission notified several of Waste
Management's waste-generating customers that Waste Management did not possess a permit or
certificate authorizing it to transport asbestos-containing waste and that further use of Waste
Management's services could subject the generators to prosecution by the Railroad Commission. 


 Waste Management filed suit against the Railroad Commission seeking a
declaratory judgment that the Railroad Commission did not have jurisdiction over the
transportation of asbestos-containing solid waste for compensation or hire. See Tex. Civ. Prac.
& Rem. Code Ann. § 37.004(a) (West 1986); Tex. Gov't Code Ann. § 2001.038 (West 1994). 
Several waste transporters intervened as defendants. Waste Management argued in the trial court
that the Railroad Commission did not possess jurisdiction to regulate transporters of asbestos-containing solid waste because such transporters were not transporting "property" as contemplated
by sections 1(g) and 4(a)(1) of the MCA. In the alternative, Waste Management argued that the
Texas Legislature's delegation of authority to the Texas Department of Health and the Texas
Water Commission (2) to control all aspects of the management of solid and hazardous waste in the
Solid Waste Disposal Act ("SWDA"), Tex. Health & Safety Code Ann. §§ 361.001-.540 (West
1992 & Supp. 1994), indicated the legislature's approval and ratification of Moore Industrial
Disposal, Inc. v. City of Garland, 587 S.W.2d 430 (Tex. Civ. App.Dallas 1979, writ ref'd
n.r.e.) (holding that sludge was not property because it had been abandoned and had no value). 
At the conclusion of the trial, the trial court determined that asbestos-containing solid waste was
not "property" as contemplated by the MCA, that the Railroad Commission did not have
jurisdiction to regulate the transportation of asbestos-containing solid waste for compensation or
hire, and that the Texas Water Commission (now the TNRCC) had exclusive jurisdiction to
regulate the transportation of industrial solid waste, including asbestos-containing solid waste
pursuant to the SWDA. The trial court also declared that Railroad Commission Tariff 14-D
(formerly 14-C), Rule 5.22, 16 Tex. Admin. Code § 5.22 (1994), and Rule 5.132, 16 Tex.
Admin. Code § 5.132 (1994), did not apply to the transportation of asbestos-containing solid
waste. (3)

 The Railroad Commission and defendant-intervenors appeal. In several points of
error, they argue that (1) the trial court erred in holding that the Railroad Commission was
without authority to regulate the transportation of asbestos-containing solid waste; (2) the trial
court erred in concluding that asbestos-containing solid waste was not property under the MCA;
(3) the trial court erred in holding that Tariff 14-D and rules 5.22 and 5.132 did not apply to the
transportation of such waste; and (4) the trial court erred in finding that the asbestos-containing
solid waste was abandoned by the generators, because (a) as a matter of law such waste cannot
be abandoned and (b) there is no evidence or insufficient evidence to support the finding.



DISCUSSION


A. THE JURISDICTION OF THE RAILROAD COMMISSION

 Waste Management presents two arguments in support of its position that the
Railroad Commission does not possess jurisdiction to regulate the transportation of asbestos-containing waste. First, it argues that we should follow the Dallas court's decision in Moore. 
The Moore court held that sludge was not property under the MCA because it had been abandoned
and had no value. Second, Waste Management argues that, in the event we disagree with the
holding in Moore, we should nevertheless follow the holding because the legislature has ratified
it through subsequent action.



 1.  Defining Property Under the MCA

 Section 4(a)(1) of the MCA empowers the Railroad Commission to regulate the
"transportation of property for compensation or hire by motor vehicle." MCA § 4(a)(1). Section
1(g) of the MCA defines a "motor carrier" as any legal entity or person that operates or owns
"any motor-propelled vehicle used in transporting property for compensation or hire over any
public highway in this state, where in the course of such transportation a highway between two
or more incorporated cities, towns or villages is traversed." MCA § 1(g) (West Supp. 1994).

 The term "property" is not defined in the MCA. Waste Management relies on the
decision in Moore to argue that asbestos-containing solid waste is not property under the MCA
because the waste (1) has no economic value and (2) has been abandoned. In Moore, Moore
Industrial Disposal sought to enjoin the City of Garland from accepting bids for the transportation
of sludge from any transporter not certified by the Railroad Commission. 587 S.W.2d at 431. 
The court held that the Railroad Commission did not have jurisdiction over the transportation of
sludge because it was not property under the MCA. The court reasoned that sludge was not
property "because the owner abandons the waste and because it has no value." Id. at 432. Noting
that other courts and the Interstate Commerce Commission had addressed the issue of whether
waste was property for purposes of their states' motor carrier acts, the court briefly summarized
the holdings of (1) the Pennsylvania Supreme Court in Masgai v. Public Service Commission, 188
A. 599, 600-01 (Pa. 1936) (holding that garbage is property because its owner continues to direct
its disposition), (2) the Interstate Commerce Commission in Joray Trucking Corp. Common
Carrier Application, 99 M.C.C. 109, 110 (1965) (holding that debris and rubble is not property
for purposes of § 202 of the Interstate Commerce Act [49 U.S.C. § 10521 (1988)]), and (3) the
Arizona Supreme Court in Visco v. State, 388 P.2d 155, 163 (Ariz. 1963) (holding that trash is
not property because it has been abandoned). After briefly reviewing these holdings, the Moore
court summarily concluded that it agreed with the reasoning of Joray and Visco and held that
sludge was not property. Moore, 587 S.W.2d at 432. (4) 

 We find the Moore court's cursory reasoning unpersuasive. In construing the
MCA, we are required to seek out the legislative intent from an examination of the entire act and
construe it in a manner that effectively carries out the intent of the legislature. Citizens Bank v.
First State Bank, Hearne, 580 S.W.2d 344, 348 (Tex. 1979). In determining legislative intent,
we begin by looking to the plain meaning of the words of the statute. See Cail v. Service Motors,
Inc., 660 S.W.2d 814, 815 (Tex. 1983); Minton v. Frank, 545 S.W.2d 442, 445 (Tex. 1976). 
The meaning of the word "property," however, is not immediately clear. The term is used in a
myriad of different contexts to encompass many different things, both tangible and intangible,
valuable and valueless. For example, Black's Law Dictionary defines property in part as
"everything that has an exchangeable value," but also defines property in part as "the right to
dispose of a thing in every legal way, to possess it, to use it, and to exclude every one else from
interfering with it." Black's Law Dictionary 1216 (6th ed. 1990). (5) The most that can be
discerned from these definitions is that, at the least, the broader definition encompasses waste,
because waste is an object that one can possess, dispose of, and exclude others from using; (6) yet
the narrower definition, based on value, does not include waste because it has no economic worth.

 These various definitions do no more than establish that valueless waste is
encompassed by some, but not all, definitions of property. To continue seeking the plain meaning
of the word when its meaning is somewhat elastic would leave us to fight an inconclusive skirmish
of definition. To resolve this problem, therefore, we must turn to an examination of the purpose
and context of the MCA to determine the precise scope of the term as it is used in the act. The
purpose of the MCA is contained in section 22b:



Declaration of Policy. The business of operating as a motor carrier of property for
hire along the highways of this State is declared to be a business affected with the
public interest. The rapid increase of motor carrier traffic, and the fact that under
existing law many motor trucks are not effectively regulated, have increased the
dangers and hazards on public highways and make it imperative that more stringent
regulation should be employed, to the end that the highways may be rendered safer
for the use of the general public; that the wear of such highways may be reduced;
that discrimination in rates charged may be eliminated; that congestion of traffic
on the highways may be minimized; that the use of the highways for the
transportation of property for hire may be restricted to the extent required by the
necessity of the general public, and that the various transportation agencies of the
State may be adjusted and correlated so that public highways may serve the best
interest of the general public.



MCA § 22b (West 1964). The declaration of policy encompasses three major goals: (1)
enhancing public safety; (2) protecting the highways of the state from excess wear and tear; and
(3) limiting uneconomic and discriminatory practices in the trucking industry. Berry v. Golden
Light Coffee Co., 327 S.W.2d 436, 438 (Tex. 1959); see also Great Nat'l Life Ins. Co. v. Chapa,
377 S.W.2d 632, 634-35 (Tex. 1964); New Way Lumber Co. v. Smith, 96 S.W.2d 282, 290 (Tex.
1936).

 In light of these legislative goals, it is clear to us that the legislature intended a
broad, rather than narrow, definition of property. The purposes of ensuring safety and controlling
the wear and tear on the State's highways are implicated whenever a truck carries any item,
regardless of its value. Thus, we agree that "it would seem to matter little whether a motor
vehicle is carrying twenty tons of garbage or twenty tons of caviar." Northern Hills Sanitation,
Inc. v. Cossart, 264 N.W.2d 711, 713 (S.D. 1978).

 In addition to the fact that the declaration of policy indicates that the legislature
intended a broad definition of property, the regulatory scheme in place at the time the legislature
enacted the MCA indicates that the legislature intended the term "property" to distinguish the
scope of the MCA from the scope of regulation of buses and other nonrail common carriers of
people. The parallel wording of article 911a, which regulates motor transportation of passengers,
is evident. The 1927 Act provided:



The term "Motor-bus Company" when used in this Act means every corporation
or person as herein defined . . . owning, controlling, operating, or managing any
motor propelled passenger vehicle, not usually operated on or over rails, and
engaged regularly in the business of transporting persons as passengers for
compensation or hire over the public highways between points within the State of
Texas . . . ." 



Act of March 15, 1927, 40th Leg., R.S., ch. 270, § 1(c), 1927 Tex. Gen. Laws 399, 400
(emphasis added) (codified as amended at Tex. Rev. Civ. Stat. Ann. art. 911a, § 1(c) (West Supp.
1994)). (7) Similarly, the MCA, passed just two years after the 1927 legislation regulating passenger
carriers, provided:


The term "motor carrier" when used in this Act denotes any person, firm,
corporation . . . or lessee who operated [sic] or causes to be operated any motor
propelled vehicle (not usually operated on or over rails) over or along the highways
or streets of this State for the purpose of carrying or transporting property for
compensation or hire . . . .



Act effective June 13, 1929, 41st Leg., R.S., ch. 314, § 1(a), 1929 Tex. Gen. Laws 698, 698
(emphasis added) (codified as amended at Tex. Rev. Civ. Stat. Ann. art. 911b, § 1(g) (West Supp.
1994)). Because of the parallel wording of these statutes and the nearly contemporaneous
enactment of them, we believe that the legislature used the word "property" in the MCA to
distinguish carriers of property from carriers of people for purposes of clearly defining the scope
of each respective area of regulation.

 Because of the clear evidence of legislative intent found both in the statute itself and
in the contemporaneous events surrounding its enactment, we believe that solid waste is property
under the MCA regardless of its value. Thus, we disagree with the Moore court's conclusion. 
We now turn to the question of whether the legislature's subsequent enactments require our
adherence to the Moore holding despite our disagreement.



 2.  Legislative Ratification and the Jurisdiction of the TNRCC

 Waste Management asserts that the 1981 and 1991 amendments to the SWDA
demonstrate the legislature's knowledge and ratification of Moore. It is true that prior to Moore
the SWDA did not explicitly empower any Texas agency to regulate the transportation of
industrial or municipal solid waste for any purpose. The original SWDA, enacted in 1969,
empowered the Texas State Department of Health to regulate the "collection, handling, storage,
and disposal of municipal solid waste" and empowered the Texas Water Quality Board to regulate
the "collection, handling, storage, and disposal of industrial solid waste . . . ." Act of May 23,
1969, 61st Leg., R.S., ch. 405, § 3(a), (b), 1969 Tex. Gen. Laws 1320, 1321; see also Act of
May 17, 1977, 65th Leg., R.S., ch. 308, § 1, 1977 Tex. Gen. Laws 825, 826 (both codified, as
amended, at SWDA §§ 361.011, .017 (West 1992)). In 1981, the legislature amended the SWDA
and empowered the Department of Health to "control all aspects of" the management of municipal
solid waste and empowered the Texas Department of Water Resources to "control all aspects of"
the management of industrial solid waste. Act of June 1, 1981, 67th Leg., R.S., ch. 831, § 3,
1981 Tex. Gen. Laws 3170, 3172-73 (codified as amended at SWDA §§ 361.011, .017) (West
1992). The 1981 amendments defined management as including "the systematic control of . . .
transportation . . . ." Act of June 1, 1981, 67th Leg., R.S., ch. 831, § 2, 1981 Tex. Gen. Laws
3170, 3171 (codified at SWDA § 361.003(21) (West 1992)). (8) In addition to amending the SWDA
in 1981, the legislature amended the SWDA in 1991 to specifically provide that the Railroad
Commission would have the power to regulate the transportation of recyclable materials. Act of
May 26, 1991, 72nd Leg., R.S., ch. 303, § 1, 1991 Tex. Gen. Laws 1267, 1272 (codified at
SWDA § 361.431 (West 1992)).

 Waste Management argues that this history indicates legislative approval of the
Moore decision. We are not persuaded by this argument, and nothing in the language or
legislative history of the 1981 and 1991 amendments convinces us otherwise. We find no
reference to Moore by members of the legislature, nor have Waste Management or its amici
directed us to any. Indeed, the legislative history of the 1981 amendments, as well as other
evidence, persuades us that the main purpose of adding "transportation" to the list of activities
regulable under the SWDA was to bring Texas into compliance with the requirements of the
federal Resource Conservation and Recovery Act in order to receive approval of the state's
hazardous waste management plan. See House Committee on Natural Resources, Bill Analysis,
Tex. H.B. 1407, 67th Leg., R.S. (1981); House Study Group, Bill Analysis, Tex. H.B. 1407,
67th Leg., R.S. (1981); Resource Conservation and Recovery Act, 42 U.S.C. §§ 6941-6949
(1988) (providing guidelines for state plans, provisions for state plan approval, and provisions for
federal financial and technical assistance to states with approved plans). The SWDA's definition
of management as including transportation tracks, word for word, regulations promulgated by the
Environmental Protection Agency pursuant to section 6942(b) of the Resource Conservation and
Recovery Act. See 40 C.F.R. § 256.02(a)(2) (1993); 42 U.S.C. § 6942(b) (1988). In particular,
the bill analysis of the House Committee on Natural Resources supports this conclusion, indicating
that the purpose of adding the term "management" and defining it to include transportation was
merely to "standardize language." House Committee on Natural Resources, Bill Analysis, supra,
at 1. The bill analysis does not mention Moore. In light of this evidence, it seems clear that the
legislature did not consider its amendments to be more than a minor change and certainly had no
intention of adopting any particular court of civil appeals' interpretation.

 More persuasive than the lack of legislative history supporting Waste
Management's position is the fact that the language of the SWDA indicates that the TNRCC
possesses the authority to regulate the transportation of solid waste for environmental purposes
rather than for purposes of preserving highways or regulating trucking. Subsection 361.002(a)
of the SWDA provides that "[i]t is the state's policy and the purpose of this chapter to safeguard
the health, welfare, and physical property of the people and to protect the environment by
controlling the management of solid waste . . . ." SWDA § 361.002(a) (West 1992) (emphasis
added). Subsection 361.011(c) provides that "[the TNRCC] shall accomplish the purposes of this
chapter by controlling all aspects of the management of municipal solid waste," SWDA
§ 361.011(c) (West 1992) (emphasis added). Finally, subsection 361.017(b) provides that "[the
TNRCC] shall accomplish the purposes of this chapter by controlling all aspects of the
management of industrial solid waste . . . ." SWDA § 361.017(b) (West 1992) (emphasis added). 
While at first blush the words "controlling all aspects of the management of" seem to indicate an
intent to foreclose all concurrent regulation by other agencies, the preceding phrase regarding the
purpose of that control indicates that the regulation of the environmental aspects of waste
transportation was the primary focus of the SWDA. We see no reason why such regulation should
preclude the Railroad Commission from using its regulatory powers to assure the economic health
of the transportation industry and the overall quality and safety of our state highways merely
because the cargo being transported over those highways is solid waste. Thus, we believe that
the Railroad Commission and the TNRCC exercise concurrent jurisdiction over the transportation
of solid waste because they each regulate a different aspect of the activity. See Lipsey v. Texas
Dep't of Health, 727 S.W.2d 61, 65 (Tex. App.Austin 1987, writ ref'd n.r.e.). (9)

 Providing final support for our conclusion is the fact that both the TNRCC and the
Railroad Commission assert that the Railroad Commission has jurisdiction over the transportation
of asbestos-containing solid waste for compensation or hire. The TNRCC and its predecessor
agencies have established numerous regulations related to environmental safety, yet have
established no regulations of the type that the Railroad Commission historically has promulgated. 
See, e.g., 30 Tex. Admin. Code §§ 335.10-.14 (1994) (establishing rules relating to shipping,
reporting, and recordkeeping of hazardous waste transported to an off-site storage facility); 30
Tex. Admin. Code § 335.92 (1994) (requiring transporters to have Environmental Protection
Agency identification numbers); 30 Tex. Admin. Code § 335.93 (1994) (requiring transporters
to respond to hazardous waste discharges). It is our duty to give weight to an administrative
agency's interpretation of its enabling statute as long as that interpretation is reasonable and does
not contradict the plain meaning of the statute. Tarrant Appraisal Dist. v. Moore, 845 S.W.2d
820, 823 (Tex. 1993). Obviously, we believe the agencies' interpretations of their respective
governing statutes to be more than reasonable.



B. ABANDONMENT

 Finally, several appellants attack the trial court's finding of fact that the asbestos-containing solid waste at issue in this case had been "abandoned" by its generators before being
transported by Waste Management. At least one of Waste Management's amici argues that the
trial court's finding of abandonment is important even if the solid waste in question is determined
to be property, using the following reasoning: (1) when property is abandoned, ownership of the
property transfers to whoever takes possession of it; (2) the generators of the asbestos-containing
solid waste abandoned the waste before Waste Management took possession of it; (3) when Waste
Management took possession of the waste, therefore, it assumed ownership of it; (4) the Railroad
Commission has authority to regulate only "transportation of property for compensation or hire";
(5) since Waste Management was transporting its own property, it could not have been
transporting it "for compensation or hire." We cannot accept this strained reasoning.

 First, the term "abandon" means "[t]o give up absolutely; to forsake entirely; to
renounce utterly; to relinquish all connection with or concern in; to desert." Black's Law
Dictionary 2 (6th ed. 1990); see also City of Anson v. Arnett, 250 S.W.2d 450, 454 (Tex. Civ.
App.Eastland 1952, writ ref'd n.r.e.). When applied to personal property, we think the term
also includes an intent by the owner to leave the property free to be appropriated by any other
person. See Hendle v. Stevens, 586 N.E.2d 826, 833 (Ill. Ct. App.), cert. denied, 596 N.E.2d
628 (Ill. 1992). Thus, it seems to us highly unlikely that a generator of asbestos-containing solid
waste could ever "abandon" such waste in the true sense, because a generator has a continuing
duty to see that the waste is disposed of in accordance with the SWDA. See SWDA §§ 361.271-.275 (West 1992 & Supp. 1994). We do not decide that question here, however, because in the
present case the parties stipulated that:



 5. From March of 1989 to November of 1991, [Waste Management] transported
for disposal approximately 71 shipments of asbestos-containing solid waste
from construction, demolition and renovation activities at industrial and other
facilities (hereinafter referred to as the "shipments").


 . . . .


 7. The shipments were transported pursuant to Uniform Hazardous Waste
Manifests as required by the Texas Water Commission.


 8. [Waste Management] was paid approximately $60,000.00 for the shipments
by the generators of this waste.


 . . . .


12. Some of the asbestos-containing solid waste transported by [Waste
Management] was accumulated at the site of the generators by asbestos
abatement companies . . . . These companies were paid for their abatement
services by the generators. In these instances [Waste Management] was hired
to transport the asbestos-containing solid waste by the asbestos abatement
companies.


 . . . .


17. The shipments transported by [Waste Management] were disposed of at either
the Atascosita Landfill located in Humble, Texas, or at the Western Waste
Landfill located in Conroe, Texas, both of which are authorized and permitted
disposal facilities.


18. The generators of the asbestos-containing solid waste in the shipments
directed [Waste Management] as to which of the landfills referenced in
Stipulation No. 17 such waste was to be taken for disposal.



We think the foregoing stipulations show conclusively that Waste Management was transporting
the waste in question "for compensation or hire," thereby subjecting the shipments to Railroad
Commission regulation. Accordingly, we need not decide whether the record contains evidence
that the generators had, in some sense, "abandoned" the waste.



CONCLUSION


 We sustain the appellants' points of error regarding the Railroad Commission's
authority to regulate the transportation of asbestos-containing solid waste, the finding that such
waste is not property, and the applicability of Tariff 14-D and Rules 5.22 and 5.132. We do not
address the appellants' points of error challenging the finding that the solid waste in question had
been abandoned. We reverse the judgment of the trial court; we render judgment that the Railroad
Commission has authority to regulate Waste Management's transportation of asbestos-containing
solid waste and that Railroad Commission Tariff 14-D and Rules 5.22 and 5.132 apply to the
transportation of such waste.



 J. Woodfin Jones, Justice

Before Justices Powers, Aboussie and Jones

Reversed and Rendered

Filed: June 29, 1994

Publish
1.   The defendant-intervenors who perfected an appeal were: Environmental
Transportation Services, Inc., Waste Processor Industries, Inc., Channel Transportation
Co., Inc., WPI Trucking, Inc., Texas Tank Truck Carriers Association, Inc., Allwaste
Environmental Services (formerly 4-K Vacuum Services, Inc.), and Bealine Service Co.,
Inc. The defendant-intervenors who did not perfect an appeal were: Best Pak Disposal,
Inc., Tricil Environmental Response, Inc., Laidlaw Environmental Services (FS), Inc.,
Resource Transportation Services, Inc., Allstate Vacuum & Tanks, Inc., and Western
Waste Industries.
2.   As of September 1, 1993, the authority to control all aspects of the management of
both municipal and industrial solid waste was given to the newly created Texas Natural
Resource Conservation Commission (TNRCC). See Act of July 30, 1991, 72nd Leg., 1st
C.S., ch. 3, art. 1, § 1.085, 1991 Tex. Gen. Laws 4, 42.
3.   Section 5.22 prohibits motor carriers from operating without a permit, certificate,
or license issued by the Railroad Commission. 16 Tex. Admin. Code § 5.22. Section
5.132 prohibits motor carriers from deviating from tariffs set by the Railroad
Commission. 16 Tex. Admin. Code § 5.132. Tariff 14-D sets such rates.
4.   Other jurisdictions also have considered the issue of whether waste is property
under those jurisdictions' motor transportation acts. See, e.g., Browning-Ferris, Inc. v.
Commonwealth, 300 S.E.2d 603, 604-05 (Va. 1983) (holding that waste is property under the
state's regulatory scheme); Northern Hills Sanitation, Inc. v. Cossart, 264 N.W.2d 711, 713
(S.D. 1978) (same); Waste Control Sys., Inc. v. State, 314 A.2d 659, 661-62 (N.H. 1974)
(deferring to the regulating agency's definition of property); Schlagel v. Hoelsken, 425 P.2d
39, 42 (Colo. 1967), cert. denied, 389 U.S. 827 (1967) (holding that the legislature had
ratified the Public Utilities Commission's treatment of waste as property regulable under the
state's act); State v. Diamond Tank Transp., 97 P.2d 145, 147 (Wash. 1939) (holding that a
garbage hauler was a contract carrier because some of the trash being transported had value).


        Since its decision in Joray, the Interstate Commerce Commission has flip-flopped on the
issue of whether radioactive waste is property under 49 U.S.C. § 10521 (1988). See Long
Island Nuclear Serv. Corp. Common Carrier Application, 110 M.C.C. 398, 403-04 (1969)
(distinguishing Joray, holding that radioactive waste is property under section 10521, and
stating that "[t]he term `property' is not defined in the act and is used therein in its broadest
context"); Nuclear Diagnostic Lab., Inc., Contract Carrier Application, 129 M.C.C. 339,
342-44 (1978) [Nuclear Diagnostic I] (holding that radioactive waste is not property for
purposes of section 10521 and distinguishing Long Island on the basis of the development of a
separate comprehensive regulatory scheme for the transportation of radioactive waste);
Nuclear Diagnostic Lab., Inc., Contract Carrier Application, 131 M.C.C. 578, 580-81 (1979)
[Nuclear Diagnostic II] (ignoring Long Island and Nuclear Diagnostic I, distinguishing Joray
on the basis that the transportation in question in Joray was of a local nature, and holding that
radioactive waste is property for purposes of section 10521).
5.   See also Spann v. City of Dallas, 235 S.W. 513, 514 (Tex. 1921) (stating that
"[p]roperty in a thing consists not merely in its ownership and possession, but in the
unrestricted right of use, enjoyment and disposal"); Webster's Third New International
Dictionary of the English Language 1818 (Philip B. Gove et al. eds., 1986) (defining property
as "the exclusive right to possess, enjoy, and dispose of a thing" and as "a valuable right or
interest primarily a source or element of wealth"); The American Heritage Dictionary of the
English Language 1049 (William Morris ed., 1973) (defining property as "[s]omething
tangible or intangible to which its owner has legal title"). The relative elasticity of the
meaning of "property" is further evidenced by section 311.005 of the Code Construction Act,
which provides that, unless "the statute or context" in which the term is used requires a
different definition, property "means real and personal property." Tex. Gov't Code Ann. §
311.005(4) (West 1988). Although this rule does not apply to the MCA, see Tex. Gov't Code
Ann. § 311.002 (West 1988) (providing for prospective application of the Code Construction
Act), it illustrates the problem we address.
6.   The fact that waste generators spend their time trying to get rid of waste, rather
than exercising their right to exclude others from it, does not change the clear fact that a
right to exclude and direct the disposition of the waste does in fact exist. Indeed, the very
focus of both federal and state environmental laws is to force generators responsibly and
appropriately to direct the disposal of the waste they have generated. See, e.g., 42 U.S.C. §
9607(a) (1988) (imposing liability on a broad range of parties, including generators of waste,
for releases of hazardous waste); SWDA §§ 361.221-.222 (West 1992) (providing for the
imposition of criminal sanctions for failure to handle and dispose of waste properly). Such
laws rest on the underlyingand unassailableassumption that those who generate waste have
the legal right to direct its disposal.
7.   The legislature amended the law regulating buses in 1929, substituting the word
"persons" for the words "persons as passengers." See Act effective Aug. 20, 1929, 41st
Leg., 1st C.S., ch. 78, § 1, 1929 Tex. Gen. Laws 196, 196 (codified as amended at Tex. Rev.
Civ. Stat. Ann. art. 911a, § 1(c) (West Supp. 1994)).
8.   In 1969, the legislature explicitly recognized the Railroad Commission's authority to
regulate the transportation, generation, and disposal of waste resulting from activities
associated with oil and gas production, exploration, and development. See Act of May 23,
1969, 61st Leg., R.S., ch. 405, § 2(5), 1969 Tex. Gen. Laws 1320, 1320 (codified as
amended at SWDA § 361.003(38) (West 1992)). Given the historic role of the Railroad
Commission in regulating all aspects of oil and gas matters, we do not consider this express
delegation of authority to the Railroad Commission to be significant to the issue before us.
9.   Waste Management does not explicitly argue the theory of implied repeal. We feel
compelled to note, however, that we believe the delegation of authority to the Railroad
Commission and TNRCC to regulate different aspects of the transportation of solid waste
forecloses that argument. See Lipsey, 727 S.W.2d at 65 n.1.