

CHIEF JUSTICE
JAMES T. WORTHEN

CLERK
CATHY S. LUSK

# TWELFTH COURT OF APPEALS

JUSTICES
SAM GRIFFITH

CHIEF STAFF ATTORNEY

Friday, June 30, 2006

Mr. James M. Baker
Castro & Baker, LLP
7433 Singing Tree
Las Vegas, NV 89123

Mr. Donald F. Killingsworth
P. O. Box 208
Tyler, TX 75710

RE:    Case Number:                12-04-00309-CV
       Trial Court Case Number:    2002-09-0666

Style: Melody Anne Obeso Verhage
       v.
       John Verhage

Enclosed is a copy of the Memorandum Opinion issued this date in the above styled and numbered cause. Also enclosed is a copy of the court's judgment.

Very truly yours,

CATHY S. LUSK, CLERK

By: *Darcy Starcher*
    Darcy Starcher, Deputy Clerk

CC:    Hon. John Ovard
       Judge Daniel B. Childs
       Ms. Marlys Sue Mason

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *MELODY ANNE OBESO VERHAGE,* <br> *APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW OF* |
| *JOHN VERHAGE,* <br> *APPELLEE* | § | *CHEROKEE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Melody Anne Obeso Verhage appeals the decree of annulment ordered by the trial court. On appeal, Melody presents five issues. We reverse and remand in part and affirm in part.

## BACKGROUND

Melody and John Verhage were married on March 28, 1998. Melody was originally from the Philippines, and the couple became acquainted through a pen pal magazine. They began corresponding and, in October 1997, John went to the Philippines to interview Melody and several other women. John and Melody met and, eventually, John proposed marriage and applied for a fiancé visa to the United States. At the time of their marriage, Melody was eighteen years old and John was sixty-eight.

On July 31, 2002, Melody left John. On September 18, 2002, John filed for divorce, accusing Melody of cruel treatment and adultery. John requested a disproportionate share of the parties' estate for several reasons, including fault in the breakup of the marriage. In his amended petition for divorce, John alleged that Melody committed actual fraud and conversion of his separate property (specifically cash in the amount of $60,000). He also alleged that Melody had breached her duty not to transmit a sexual disease to him. In her original and amended answers,

Melody asked that she be awarded a disproportionate share of the parties' estate, alleging that John breached his duty not to transmit a sexual disease to her and committed fraud by converting her share of a 2000 Ford Mustang automobile.

At pretrial hearings and a nonjury trial, Melody and John testified regarding their courtship, as well as their marriage and its eventual disintegration. John testified that he wanted to find a good wife who would stand beside him for the rest of his life. He accused Melody of adultery and cruel treatment. Melody stated that she agreed to marry John because he was nice to her, God fearing, impressive, and made promises to her. Melody admitted that she did not love John when she came to the United States, but cared for him. Both admitted that John spent money on Melody and her family in the Philippines. John testified that Melody stole money from him and that approximately $60,000 was missing from a safe in his house. Both John and Melody had genital herpes, and each accused the other of transmitting it. Additional accusations were made by both parties during the trial regarding credit cards, bank accounts, and cruel treatment during their marriage. At the conclusion of the trial, the trial court found, in part, that the 2000 Ford Mustang was a gift to Melody and her separate property, that John failed to meet his burden to trace the $60,000 cash he alleged Melody converted, that the medical evidence was insufficient to prove transmittal of the sexual disease, that Melody admitted love was not the basis of the relationship, and that the inception of the marriage was a fraudulent relationship intended for the purpose of finding and procuring resident status and obtaining funds to benefit Melody and her family.

On August 3, 2004, the trial court ordered an annulment. In the decree of annulment, the trial court also found that Melody abandoned the 2000 Ford Mustang, that John sold the Mustang due to her abandonment and retained the funds from the sale, and that any value of the Mustang was offset by Melody's fraud in diverting John's separate property funds for her and her family's benefit. After proper requests, the trial court filed findings of fact and conclusions of law and additional findings of fact. This appeal followed.

## STANDARD OF REVIEW

A trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence under the same legal standards applied to review jury verdicts for legal and factual sufficiency of

2

the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *M.D. Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). In considering whether the evidence is legally sufficient, we consider only the evidence and inferences tending to support the trial court's findings and disregard all evidence to the contrary. *M.D. Anderson*, 806 S.W.2d at 794-95. We must consider evidence in the light most favorable to the trial court's findings and indulge every reasonable inference that would support them. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). In our review, we must credit favorable evidence if a reasonable trier of fact could and disregard contrary evidence unless a reasonable trier of fact could not. *See id.* at 827. However, we must not substitute our judgment for that of the trial court as long as the evidence falls within the zone of reasonable disagreement. *See id.* at 822.

In reviewing factual sufficiency, we must weigh all of the evidence in the record. *Ortiz*, 917 S.W.2d at 772. Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* However, when the appellate record contains a reporter's record, findings of fact are not conclusive on appeal if the contrary is established as a matter of law or if there is no evidence to support the finding. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 257 (Tex. App.–Houston [14th Dist.] 2003, pet. denied).

We review the trial court's conclusions of law de novo. *Id.* The standard of review for conclusions of law is whether they are correct. *Id.* We will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Id.* Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

## ANNULMENT

In her first issue, Melody argues that the trial court erred in ordering an annulment because neither party requested an annulment and neither the pleadings or the evidence support an annulment. The judgment of a trial court shall conform to the pleadings of the parties. TEX. R. CIV. P. 301; *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 812 (Tex. 1983). Further, a judgment must be supported by the pleadings and, if not, it is erroneous. *Cunningham*, 660 S.W.2d at 813. A party may not obtain a judgment based upon a theory not pleaded. *Affiliated Capital Corp. v.*

*Musemeche*, 804 S.W.2d 216, 219 (Tex. App.–Houston [14th Dist.] 1991, writ denied). Thus, a party may not be granted relief in the absence of pleadings to support that relief. *Cunningham*, 660 S.W.2d at 813; *Holmstrom v. Lee*, 26 S.W.3d 526, 532 (Tex. App.–Austin 2000, no pet.). Both Melody and John pleaded for a divorce, not an annulment. However, the trial court ordered that their marriage be annulled, contrary to the pleadings of both parties. Because a judgment must be supported by the pleadings and neither party pleaded for an annulment, the trial court's decree of annulment is erroneous. *See Cunningham*, 660 S.W.2d at 812-13; *Holmstrom*, 26 S.W.3d at 532.

However, in its initial findings of fact and conclusions of law, the trial court determined that Melody's fraud to induce John to marry was tried by implied consent pursuant to Rule 67 of the Texas Rules of Civil Procedure. To support this ground for annulment, the trial court found that John did not learn of Melody's fraud until after their separation and, thereafter, the parties had not cohabited.[1] In its additional findings of fact, the trial court found that Melody induced John to marry her by material false representations "that she loved him, [that] she intended to engage in and remain in a traditional perpetual marriage, and [that] she intended to care for him in his advancing years and declining health." The trial court found that Melody intended for John to rely upon such false representations and that he relied upon them in his decision to marry her. Further, the trial court found that Melody engaged in a plan of "intended deceit" to marry John for the "sole purpose" of obtaining legal status in the United States and of obtaining as much of John's liquid assets as possible. The record shows that Melody and John both pleaded for a disproportionate share of the parties' estate based, in part, upon fault in the breakup of the marriage. John argues that the issue supporting an annulment, fraudulent inducement to marry, was tried by consent. Melody disagrees.

Rule 67 of the Texas Rules of Civil Procedure allows issues not raised by the pleadings that are tried by express or implied consent to be treated in all respects as if they had been raised in the pleadings. TEX. R. CIV. P. 67. However, the doctrine of trial by consent is limited to those exceptional cases where the parties clearly tried an unpleaded issue by consent. *In re Walters*, 39 S.W.3d 280, 289 (Tex. App.–Texarkana 2001, no pet.). This doctrine should be applied cautiously,

---

[1] A trial court may grant an annulment of a marriage to a party to the marriage if (1) the other party used fraud, duress, or force to induce the petitioner to enter into the marriage; and (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud or since being released from the duress or force. TEX. FAM. CODE ANN. § 6.107 (Vernon 1998).

not in doubtful situations, and only where it appears from the record that the issue was actually tried, although not pleaded. *Id.* When evidence relevant to both a pleaded and an unpleaded issue has been admitted without objection, the doctrine of trial by consent should not be applied unless clearly warranted. *Id.* To determine whether an issue was tried by consent, we must examine the record for evidence of trial of the matter, rather than evidence of the issue. *Id.*

A trial court has wide discretion in dividing the estate of the parties; thus, many factors may be considered in making a just and right division of the property. *See Murff v. Murff*, 615 S.W.2d 696, 698-99 (Tex. 1981). Both John and Melody sought a disproportionate share of the marital estate. At trial, Melody and John testified regarding the origins of their relationship, their marriage, and its subsequent deterioration. Testimony regarding the origins of the marriage, including Melody's love or lack thereof for John, her reasons for marrying John, and the subsequent breakup of the marriage is relevant to the division of property, an issue pleaded by both parties. *See In re Walters*, 39 S.W.2d at 289. Moreover, John specifically alleged actual fraud as a reason he should receive a disproportionate share of the estate. Therefore, the issue of fraud was supported by the pleadings insofar as it related to the issue of property division. However, neither party sought an annulment. Because evidence relevant to a pleaded issue, division of property, was admitted without objection, we cannot apply the doctrine of trial by consent to the issue of the unpleaded issue, annulment, unless clearly warranted. *See id.* Both John and Melody requested a divorce in their pleadings and at trial during closing arguments. Neither mentioned an annulment. As such, we can surmise that neither party contemplated that the trial court would order an annulment instead of a divorce. Therefore, because there is no evidence in the record that the issue of annulment was actually tried before the court, we cannot apply the doctrine of trial by consent to the issue. *See id.* Accordingly, Melody's first issue is sustained.

## DIVESTITURE OF THE MUSTANG

In her second issue, Melody contends that the trial court erred as a matter of law by divesting her of her separate property, the 2000 Ford Mustang. John disagrees, arguing that the trial court imposed a charge against Melody's separate estate that could be validly paid through forced sale or foreclosure.

## Applicable Law

All property, both real and personal, owned or claimed by a spouse before marriage, and that acquired afterward by gift, devise, or descent, shall be the separate property of that spouse. TEX. CONST. art. XVI, § 15. If one spouse makes a gift of property to the other, that gift is presumed to include all the income or property which might arise from that gift of property. *Id.* The constitution contains the exclusive definition of separate property, and the legislature cannot alter or enlarge upon it. *Cameron v. Cameron*, 641 S.W.2d 210, 213 (Tex. 1982). Thus, the Texas Family Code defines a spouse's separate property as that property acquired by the spouse during marriage by gift, devise, or descent. TEX. FAM. CODE ANN. § 3.001(2) (Vernon 1998). Any judicial divestiture of separate property would essentially disregard the constitutionally mandated distinction between the separate and community property of spouses. *Cameron*, 641 S.W.2d at 213. Moreover, allowing a trial court to divest separate property from one spouse and award it to the other spouse as part of the latter's separate estate would impermissibly enlarge the exclusive constitutional definition of separate property. *Id.*

In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage. TEX. FAM. CODE ANN. § 7.001 (Vernon 1998). The phrase "estate of the parties" refers only to community property. *Cameron*, 641 S.W.2d at 214. Section 7.001 of the Texas Family Code authorizes a "division of the estate of the parties," but provides no authority for a court to "divest" a divorcing spouse's separate property. *See id.* at 215. Subject to certain exceptions not applicable here, the power of a trial court is limited to a disposition of the community property and does not include the power to dispose of separate property. *Id.* at 216.

## Analysis

In the decree of annulment, the trial court found that the 2000 Ford Mustang was a gift from John to Melody and that the value of the Mustang was "more than set off" by Melody's fraud in diverting John's separate property funds for her and her family's benefit. In its findings of fact and conclusions of law, the trial court found that the Mustang was her separate property, and that the value of the Mustang was less than the amount of John's separate property funds taken by Melody by and through her fraud in the inducement to marry. John admitted selling the Mustang in August

6

2002 and, therefore, the trial court found that the Mustang was unavailable for division and/or distribution in kind.

According to the trial court, the Texas Constitution, and the Texas Family Code, the 2000 Ford Mustang was Melody's separate property by gift. *See* TEX. CONST. art. XVI, § 15; TEX. FAM. CODE ANN. § 7.001. Neither party disputed the trial court's finding. Because the Mustang was Melody's separate property, the trial court had no authority to divest her of that property. *Cameron*, 641 S.W.2d at 215. Therefore, we conclude that trial court erred as a matter of law by divesting Melody of the Mustang. Accordingly, Melody's second issue is sustained.

## ABANDONMENT OF MUSTANG

In her third issue, Melody contends that there was insufficient evidence to support the trial court's finding that she intended to abandon the 2000 Ford Mustang. John disagrees. In its decree of annulment, the trial court found that Melody abandoned the Mustang. Additionally, the trial court found that Melody intended to abandon the Mustang. "Abandon" means to give up absolutely, to forsake entirely, to renounce utterly, to relinquish all connection with or concern in, and to desert. *R.R. Comm'n of Texas v. Waste Mgmt. of Texas, Inc.*, 880 S.W.2d 835, 843 (Tex. App.–Austin 1994, no writ). When applied to personal property, the term also includes an intent by the owner to leave the property free to be appropriated by any other person. *Id.*

Melody testified that, when she left John on July 31, 2002, she was unable to take the Mustang with her. Melody stated that she was not a very experienced driver and what experience she had was in town. According to Melody, she did not have enough confidence to drive to California. Thus, Melody left the Mustang in the Sam's Club parking lot in Tyler, Texas. She telephoned John's daughter, Nanette Elaine Verhage, told Nanette that she was leaving John, and asked Nanette to pick up the Mustang. Melody denied abandoning the Mustang. Nanette testified that Melody called, stating the Mustang was in the Sam's Club parking lot and that it needed to be picked up. John's son, Daniel Verhage, testified that he, his wife, and his wife's friend picked up the Mustang from the Sam's Club parking lot. According to Daniel, the keys were in the Mustang, but he did not believe that the Mustang was locked. John testified that Melody told Nanette to have him take his keys to open the Mustang.

7

The evidence tending to support the trial court's findings includes Melody's leaving the Mustang in the parking lot of Sam's Club in Tyler, instead of driving it to California. The automobile was left with the keys inside and may have been unlocked. However, we cannot disregard contrary evidence unless a reasonable trier of fact could not. *See City of Keller*, 168 S.W.3d at 827. Contrary to the findings, Melody requested that Nanette pick up the Mustang or arrange for its retrieval. Moreover, the great weight and preponderance of the evidence does not support the findings that Melody abandoned and intended to abandon the Mustang because she never renounced or relinquished her ownership of the vehicle and she arranged for its retrieval by Nanette or someone of her choosing. *See Ortiz*, 917 S.W.2d at 772. Because the evidence does not tend to support these findings and they are against the great weight and preponderance of the evidence, the evidence is both legally and factually insufficient to support the trial court's findings that Melody abandoned and intended to abandon the 2000 Ford Mustang. Accordingly, Melody's third issue is sustained.

## ACQUISITION OF PROPERTY

In her fourth issue, Melody argues that there was insufficient evidence to support the trial court's finding that she obtained a large amount of John's separate property liquid assets, primarily cash from his safe, without his knowledge or consent. John disagrees.

According to John, he had approximately $60,000 cash in a new keyed safe after he and Melody were married. After buying the safe, John did not see the safe again until three years later. After Melody left, he found a spare key, opened the safe, and found that the money was gone. However, the safe contained a piece of paper with a notation of "54,545.95" written in Melody's handwriting. John admitted that he had not looked in the safe in over two years nor had his children. John offered no other documentation to support his testimony that he had $60,000 in the safe at the time of his marriage or any other documentary evidence showing the amounts of money entering or leaving the safe. Moreover, none of John's children who testified recalled seeing the safe or the amount of funds in the safe that John alleged.

As far as other separate property liquid assets allegedly taken by Melody, John admitted that he spent large sums of money on Melody's family in the Philippines, sending them approximately $15,000 to $20,000 per year, buying them a multicab, and paying for Melody's sister's medical bills

8

and funeral. Further, John admitted making transfers of money to the Philippines and knew that Melody sent money he gave her to her ill sister. John offered no documentary evidence to prove that Melody diverted funds from his accounts or cash holdings to send to her family without his permission.

Even if we consider only the evidence tending to support the trial court's finding, we cannot disregard evidence contrary to the trial court's finding. *See City of Keller*, 168 S.W.3d at 827. Moreover, without documentary evidence, the trial court's findings are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ortiz*, 917 S.W.2d at 772. Because the evidence does not tend to support this finding and it is against the great weight and preponderance of the evidence, the evidence is legally and factually insufficient to support the trial court's finding that Melody obtained a large amount of John's separate property liquid assets (primarily cash from his safe) without his knowledge or consent. Accordingly, Melody's fourth issue is sustained.

## SEXUALLY TRANSMITTED DISEASE

In her fifth issue, Melody contends that the trial court's finding that there was insufficient evidence regarding the cause of the parties' sexually transmitted disease was against the great weight and preponderance of the evidence. John disagrees.

The evidence shows that Melody began showing signs of genital herpes, a sexually transmitted disease, at the beginning of August 2001. She denied having sexual relations with anyone other than John during their marriage. Melody testified that, prior to her outbreak, John had reddish spots on his penis. However, John was not tested for genital herpes at that time. Melody stated that she was diagnosed with genital herpes in February 2002. John testified that Melody had extramarital affairs and that they rarely had sex. Although John testified at one point that none of his former wives had a sexually transmitted disease, he later admitted that his third wife informed him that she had a sexually transmitted disease prior to meeting him. John alleged in his pleading that Melody transmitted a sexual disease to him, but, at trial, denied having a sexually transmitted disease, ever having an outbreak, or ever being told that he had a sexually transmitted disease. However, John admitted that, in October 2002, he was treated for internal pain in his urinary tract and an ulcerative lesion on his genitals. John admitted that medical records show he tested positive

9

for herpes simplex virus one and two in November 2003. According to John, Melody did not contract genital herpes from him.

The record shows and the trial court noted that no medical expert testified during trial regarding the incubation period, rates of transmission, or how transmission occurs in genital herpes. The cause of Melody's and John's genital herpes must be shown by competent evidence. *See Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 241 (Tex. App.–Houston [14th Dist.] 2002, no pet.). Lay testimony will suffice when general experience and common sense will enable a lay person fairly to determine the causal nexus. *Id.* However, whether Melody or John caused the other to contract genital herpes is not a question that can be answered by general experience and common sense. *See Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1996); *Praytor*, 97 S.W.3d at 241. As such, expert testimony is required. *Praytor*, 97 S.W.3d at 241. When expert testimony is required, lay evidence supporting causation is legally insufficient. *See City of Keller*, 168 S.W.3d at 812.

Because both Melody and John failed to support their claims regarding the cause of their sexually transmitted disease with expert medical testimony, the trial court's finding that there was insufficient evidence regarding the cause of the parties' sexually transmitted disease was not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ortiz*, 917 S.W.2d at 772. Accordingly, Melody's fifth issue is overruled.

## CONCLUSION

Having sustained Melody's first, second, third, and fourth issues, we *reverse* the decree of annulment and *remand* to the trial court for the entry of a divorce decree consistent with this opinion. In all other respects, the trial court's judgment is *affirmed*.

        JAMES T. WORTHEN
        Chief Justice

Opinion delivered June 30, 2006.
*Panel consisted of Worthen, C.J. and Griffith, J.*

(PUBLISH)

10



# COURT OF APPEALS

## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

## JUDGMENT

JUNE 30, 2006

## NO. 12-04-00309-CV

**MELODY ANNE OBESO VERHAGE,**

Appellant

V.

**JOHN VERHAGE,**

Appellee

Appeal from the County Court at Law
of Cherokee County, Texas (Tr.Ct.No.2002-09-0666)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being inspected, it is the opinion of the Court that there was error in the judgment as entered by the trial court, and that the same should be **REVERSED AND REMANDED IN PART**, and **AFFIRMED** in part.

It is therefore ORDERED, ADJUDGED and DECREED that that portion of the trial court's judgment regarding the decree of annulment be **REVERSED** and the cause **REMANDED** to the trial court for an entry of a divorce decree consistent with this opinion. In all other respects, the trial court's judgment is **AFFIRMED**. All costs of this appeal be, and the same are, adjudged against the parties incurring same, for which let execution issue; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J. and Griffith, J.*